Dan Stormer, Esq. [S.B. #101967]
Barbara Enloe Hadsell, Esq. [S.B. #086021]
Shaleen Shanbhag, Esq. [S.B. #301047]
Tanya Sukhija-Cohen, Esq. [S.B. #295589]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
        bhadsell@hadsellstormer.com
        sshanbhag@hadsellstormer.com
        tanya@hadsellstormer.com

Attorneys for Plaintiff
JOHN SYLVESTER PENNY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN SYLVESTER PENNY,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LOS ANGELES; CHIEF OF POLICE MICHEL MOORE; SAMI AZMY, JONATHAN A. CONCETTI, DANIEL ANTALEK, BLAIR A. SPRAGGINS, ANTONIO ROBLES, LAWRENCE PARK, JORGE ESTRADA, AMJAD AZIZ, SERGIO GRACIANO, MIGUEL LARA, JOSE HERNANDEZ; and DOES 7-10,<br><br>Defendants. | Case No.: 2:20-cv-07211-DMG-MAA<br><br>[Assigned to the Honorable Dolly M. Gee – Courtroom 8C, 8th Floor]<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]**<br><br>DATE:          April 8, 2022<br>TIME:          2:00 p.m.<br>PLACE:        Courtroom 8C<br><br>Complaint Filed:     August 11, 2020<br>Discovery Cut-off:   February 15, 2022<br>Motion Cut-off:      April 8, 2022<br>Trial:               June 28, 2022 |

# **TABLE OF CONTENTS**

Page(s)

Table of Authorities ...................................................................................... iv

MEMORANDUM OF POINTS AND AUTHORITIES .................................... 1

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF UNDISPUTED FACTS ........................................... 2

      A.    John Penny Is a Homeless Man ███████ ........................ 2

      B.    LAPD Dispatch Radios a Call for Service Regarding a
            Screaming Man ......................................................................... 2

      C.    Officers Encounter a Shirtless Mr. Penny Yelling
            Incoherent Statements and Carrying a Bottle .......................... 3

      D.    Mr. Penny Repeatedly Asks "What's a Real Blunt" and Backs
            Away After Antalek Unsuccessfully Tases Him ....................... 3

      E.    Four Backup Officers, Including Concetti and Azmy, Arrive ...... 3

      F.    Azmy Takes the Lead in Communicating with Mr. Penny ......... 4

      G.    The Officers Track Mr. Penny and Tell Mr. Susser To Go Inside ... 4

      H.    Mr. Penny Continues to Talk About a "Real Blunt" and
            Picks Up Another Object .......................................................... 5

      I.    Azmy Warns Mr. Penny He Will Be Shot with a Beanbag Shotgun ... 6

      J.    Six More Officers Arrive Prior to the Shooting ........................ 6

      K.    Mr. Penny Picks Up a Wooden Board and Walks Back to the
            South Side of Thornton Court as Concetti Unholsters His Pistol ..... 7

      L.    Concetti Sets a Threshold for Mr. Penny .................................. 7

      M.    Concetti Fires Two Shots at Mr. Penny .................................... 8

N.  ██████████████████████████
    ████████████████████████████
    ████████.................................................................... 9

    1.  Concetti's use of lethal force was not objectively
        reasonable and was out of policy.................................... 10

    2.  Azmy's decision to assume the role of primary communicator
        deviated without justification from Department policy and
        supervisory training ................................................... 10

O.  Concetti and Azmy Violated Generally Accepted Police
    Practices, Training, and the LAPD's Own Policies..................... 11

    1.  Pre-Shooting Tactics.................................................. 11

    2.  Use of Deadly Force ................................................. 12

III.  LEGAL STANDARD ................................................................ 13

IV.  ARGUMENT ............................................................................. 14

A.  Plaintiff is Entitled to Summary Judgment on his First Cause
    of Action for Excessive Force in Violation of the Fourth
    Amendment against Defendants Concetti and Azmy ................................ 14

    1.  Concetti Used Excessive and Unreasonable Deadly Force.............. 14

        a.  The crime at issue was not severe ........................................... 15

        b.  Mr. Penny did not pose an immediate threat
            of death or serious bodily injury ............................... 15

        c.  Mr. Penny was not actively resisting or fleeing..................... 16

        d.  Mr. Penny was mentally ill ................................................ 17

        e.  Concetti did not consider alternatives to lethal force............. 18

        f.  Concetti made pre-shooting tactical errors .......................... 18

g.     Concetti failed to give Mr. Penny a lethal force warning ....... 19

h.     Mr. Penny was outnumbered by 13 officers ........................... 20

i.     Concetti had ample time to observe Mr. Penny ..................... 20

2.    Azmy Is Liable for Concetti's Use of Unreasonable Deadly Force as an Integral Participant and Supervisor ................................................ 22

B.    Plaintiff is Entitled to Summary Judgment on his Second Cause of Action for Failure to Intervene in Violation of the Fourth Amendment against Defendants Concetti and Azmy ..................... 24

C.    Plaintiff is Entitled to Summary Judgment on his Ninth, Eleventh, Twelfth and Fourteenth Causes of Action for the Bane Act, Assault, Battery by a Peace Officer, and Negligence against Defendants Concetti and Azmy ...................................................................................... 24

V.    CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Avina v. United States*
681 F.3d 1127 (9th Cir. 2012) ....................................................................... 25

*Blankenhorn v. City of Orange*
485 F.3d 463 (9th Cir. 2007) ......................................................................... 22

*Boyd v. Benton Cnty.*
374 F.3d 773 (9th Cir. 2004) ................................................................... 22, 23

*Bresaz v. Cnty. of Santa Clara*
No. 14-CV-3868, 2015 U.S. Dist. LEXIS 32908
(N.D. Cal. Mar. 17, 2015) ...................................................................... 22, 23

*Brown v. Grinder*
No. 2:13-CV-1007, 2019 U.S. Dist. LEXIS 10236
(E.D. Cal. Jan. 22, 2019) ............................................................................. 23

*Bryan v. MacPherson*
630 F.3d 805 (9th Cir. 2010) ............................................... 15, 16, 18, 20

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ..................................................................................... 13

*Chaudhry v. City of Los Angeles*
751 F.3d 1096 (9th Cir. 2014) ..................................................................... 25

*Cooper v. Brown*
156 F. Supp. 3d 818 (N.D. Miss. 2016) ..................................................... 14

*Cruz v. City of Anaheim*
765 F.3d 1076 (9th Cir. 2014) ..................................................................... 16

*Cunningham v. Gates*
229 F.3d 1271 (9th Cir. 2000) ..................................................................... 24

*Deorle v. Rutherford*
272 F.3d 1272 (9th Cir. 2001) ............................................................. *passim*

/ / /

*Dillenbeck v. City of Los Angeles*
   69 Cal. 2d 472 (1968) ................................................................................. 25

*Drummond v. City of Anaheim*
   343 F.3d 1052 (9th Cir. 2003) ..................................................................... 17

*Glenn v. Washington Cnty.*
   673 F.3d 864 (9th Cir. 2011) ................................................................ *passim*

*Graham v. Connor*
   490 U.S. 386 (1989) ............................................................................ *passim*

*Griffith-Guerrero v. Spokane Cnty.*
   No. 2:15-CV-342, ECF No. 42 (E.D. Wash. June 27, 2017) ....................... 13

*Grudt v. City of Los Angeles*
   2 Cal. 3d (1970) ......................................................................................... 25

*Halbert v. Cnty. of San Diego*,
   No. 07cv1607-L(WVG), 2010 U.S. Dist. LEXIS 30563
   (S.D. Cal. Mar. 30, 2010) ........................................................................... 23

*Harris v. Roderick*
   126 F.3d 1189 (9th Cir. 1997) ..................................................................... 15

*Hayes v. Cnty. of San Diego*
   736 F.3d 1223 (9th Cir. 2013) ..................................................................... 25

*Headwaters v. Cnty. of Humboldt*
   240 F.3d 1185 (9th Cir. 2000) ..................................................................... 18

*Hopkins v. Bonvicino*
   573 F.3d 752 (9th Cir. 2009) ....................................................................... 22

*Hymes v. Bliss*
   No. 16-cv-04288-JSC, 2018 U.S. Dist. LEXIS 193518
   (N.D. Cal. Nov. 13, 2018) ........................................................................... 24

*Jones v. Williams*
   297 F.3d 930 (9th Cir. 2002) ....................................................................... 22

*Lolli v. Cnty. of Orange*
   351 F.3d 410 (9th Cir. 2003) ....................................................................... 23

/ / /

*Longoria v. Pinal Cnty.*
  873 F.3d 699 (9th Cir. 2017) .................................................................. 17, 20

*Mullenix v. Luna*
  577 U.S. 7 (2015) ................................................................................... 14

*Munoz v. City of Union City*
  120 Cal. App. 4th 1077 (2004) ............................................................... 25

*Nelson v. City of Davis*
  685 F.3d 867 (9th Cir. 2012) .................................................................. 18, 20

*Nicholson v. City of L.A.*
  935 F.3d 685 (9th Cir. 2019) .................................................................. 22

*Price v. Sery*
  513 F.3d 962 (9th Cir. 2008) .................................................................. 15

*S.R. Nehad v. Browder*
  929 F.3d 1125 (9th Cir. 2019) ................................................................ 14, 20

*Slater v. Deasey*
  789 F. App'x 17 (9th Cir. 2019) ............................................................. 17

*Smith v. City of Hemet*
  394 F.3d 689 (9th Cir. 2005) .................................................................. 14

*Starr v. Baca*
  652 F.3d 1202 (9th Cir. 2011) ................................................................ 23

*Tennessee v. Garner*
  471 U.S. 1 (1985) ................................................................................... 14

*In re Toyota Motor Corp. Unintended Acceleration Mktg.,*
*Sales Practices & Prods. Liab. Litig.*
  978 F. Supp. 2d 1053 (C.D. Cal. 2013) .................................................. 13

*United States v. Koon*
  34 F.3d 1416 (9th Cir. 1994) .................................................................. 24

*United Steel Workers of America v. Phelps Dodge Corp.*
  865 F.2d 1539 (9th Cir. 1989) ................................................................ 13

*Vos v. City of Newport Beach*
  892 F.3d 1024 (9th Cir. 2018) ................................................................ 15, 19

*Washington v. Lambert*
  98 F.3d 1181 (9th Cir. 1996) ....................................................................................... 15, 20

**Constitutional Provisions**

U.S. Const. amend IV ..................................................................................... *passim*

**Federal Rules**

Rule 56 ....................................................................................................................... 13

Rule 56(a) ................................................................................................................. 13

Rule 56(c) ................................................................................................................. 13

**State Statutes**

Civil Code § 52.1 (Bane Act)…………………………………………………..2, 24, 25

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3          After extensively reviewing the facts of this tragic case, the Los Angeles Board of

4   Police Commissioners ("BOPC") made the final, unreviewable determination that Officer

5   Jonathan Concetti's decision to shoot Plaintiff John Penny, a homeless man

6

7

8

9                                                These undisputed facts alone mandate summary judgment on

10   Plaintiff's Fourth Amendment claims against Defendants Concetti and Azmy.

11          On August 14, 2019, Los Angeles Police Department ("LAPD") officers responded

12   to a 911 call regarding a shirtless man screaming "Don't shoot." For six minutes after his

13   arrival on scene, Concetti observed Mr. Penny. Mr. Penny, just steps away from the

14   parking area where he slept with the owner's permission, was obviously emotionally

15   disturbed. He rambled, invited officers to kill him, and repeatedly asked nonsensical

16   questions including "What's a real blunt?" while moving about, walking toward and away

17   from the officers. Though Mr. Penny picked up various objects, such as a bottle, a heavy

18   cloth object, and a wooden board, he never threw these objects at the officers, did not run

19   at the officers, did not attempt to flee, and never threatened or injured the officers or

20   anyone else.

21          Body worn camera video shows that immediately prior to the shooting, Mr. Penny

22   held a wooden board close to his chest "like a shield", was surrounded by seven officers,

23   and made no movement suggesting he would attack them. Concetti admits that he decided,

24   without any objectively reasonable basis, that if Mr. Penny crossed a certain line he would

25   shoot him. Mr. Penny took two small steps and crossed the arbitrary line Concetti created

26   in his mind. Concetti fired his pistol. Of the seven officers, three discharged less-lethal

27   weapons. No other officer used deadly force.

28          Concetti unnecessarily escalated the situation leading to his unreasonable use of

deadly force—he shot despite knowing other less lethal force options were available, ignored his supervisor Azmy's directives to use less lethal force, ignored the property owner's attempts to offer information about Mr. Penny, gave no lethal force warning, failed to utilize time, distance, or cover, and did not consider less intrusive alternatives, all in violation of standard police practices, LAPD policies, and training. Azmy's tactical errors, including his failure to control Concetti as the Sergeant on scene, contributed to the shooting. Mr. Penny did not pose an immediate threat of serious bodily injury or death to anyone, and instead needed medical and mental health intervention.

Based on the undisputed facts viewed in Defendants' favor, there is no genuine issue of material fact that Defendants Concetti and Azmy violated Plaintiff's Fourth Amendment rights. For these same reasons, the Court should enter summary judgment on Plaintiff's state law claims of battery, assault, negligence, and Bane Act against Azmy and Concetti.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    John Penny Is a Homeless Man

Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment ("SUF") 1. SUF 2. SUF 3.

### B.    LAPD Dispatch Radios a Call for Service Regarding a Screaming Man.

At approximately 5:42 p.m. on August 14, 2019, LAPD Dispatch radioed a call for service regarding a man in the Thornton Court alleyway between Pacific Avenue and Speedway screaming "Don't shoot." SUF 4. LAPD Officers Daniel Antalek and Antonio Robles responded. While Antalek drove to the scene, Robles reviewed the comments on the radio call: "A male subject, male black, shirtless with dark pants screaming in the alleyway of Thornton Court and Pacific." SUF 6-7.

**C.    Officers Encounter a Shirtless Mr. Penny Yelling Incoherent Statements and Carrying a Bottle.**

As Antalek drove northbound on Pacific Avenue, he saw a shirtless Mr. Penny with a bottle in his hand, approaching the police car, and yelling incoherent statements. SUF 8. Robles saw Mr. Penny walking in traffic on Pacific Avenue with an object in his hand while sweating profusely. SUF 9. Antalek parked, exited the vehicle, and approached Mr. Penny to get him out of the road and into the alley. SUF 10. Mr. Penny said, "Hey, you get to kill me today." SUF 11. Antalek ordered Mr. Penny to "Put the bottle down." SUF 12. Robles exited the vehicle and observed Mr. Penny, who did not appear to understand Antalek. SUF 13. Robles requested an additional unit and a supervisor, retrieved his 40-millimeter launcher, and then requested backup. SUF 14-16.

**D.    Mr. Penny Repeatedly Asks "What's a Real Blunt" and Backs Away After Antalek Unsuccessfully Tases Him.**

Mr. Penny repeatedly asked "What's a real blunt" during the entirety of the incident. SUF 17. Mr. Penny walked toward Antalek, Robles, and bystanders with the bottle in his hand. SUF 18. He was sweating, rambling, and making incoherent statements. SUF 19. ███████████████████████████████████████████ ███ SUF 20.

Antalek said "Put the bottle down, I'll Tase you" while pointing his Taser at Mr. Penny. SUF 21. Mr. Penny picked up an empty cardboard box and threw it after Robles told him to drop it. SUF 22. Antalek discharged his Taser at Mr. Penny, but the Taser did not connect and was ineffective. SUF 23-24. After being Tased, Mr. Penny backed away from Antalek and Robles and walked westbound down Thornton Court. SUF 25.

**E.    Four Backup Officers, Including Concetti and Azmy, Arrive.**

LAPD Officers Jonathan Concetti, Blair Spraggins, Miguel Lara, and Sergeant Sami Azmy arrived at this time. SUF 26. Concetti could not recall discussing tactics with his partner Spraggins prior to arriving on scene. SUF 27-28. Concetti had no information that a crime had been committed or anyone had been injured when he arrived. He observed

Mr. Penny to be agitated and holding a glass bottle in his right hand. SUF 29-30.

All the officers testified that Mr. Penny appeared to be under the influence of drugs and/or alcohol, or could possibly be suffering from a mental illness. SUF 33-40.

### F.   Azmy Takes the Lead in Communicating with Mr. Penny

Sergeant Azmy, the highest-ranking officer and supervisor on scene, took command upon his arrival. SUF 41. Azmy saw Mr. Penny appear in the middle of the alley with a glass bottle. SUF 42. He decided to take over communications with Mr. Penny, telling him to calm down and drop the bottle. Mr. Penny walked away. SUF 43-44.

Azmy testified that he directed the officers to have one designated lethal cover officer and less lethal options. He designated Antalek as the lethal cover officer but did not designate less lethal officers because Robles already had a 40-millimeter launcher and Spraggins retrieved a beanbag shotgun. Azmy directed Lara to retrieve a shield and gave no assignment to Concetti. He testified he left Concetti and Lara with "free hands" to use as an arrest team. SUF 45-48, 50.

Concetti assumed the role of communications without instruction, because lethal and less lethal were already designated. He was not designated as the lethal cover officer until after he shot Mr. Penny. SUF 49.

Spraggins was unaware of any specific designations given to officers and testified that they "merely adapted to the situation." SUF 51. Similarly, Robles did not hear Azmy give any instructions, and had no understanding of the other officers' roles or whether anyone was designated lethal or less lethal. He testified there was no tactical plan discussed upon the backup officers' arrival. SUF 52-53. Likewise, Lara was unaware if Azmy gave other officers instructions and received no instructions other than to get the shield. SUF 54.

### G.   The Officers Track Mr. Penny and Tell Mr. Susser To Go Inside.

All six officers formed a line and tracked Mr. Penny as he walked away from them, westbound down Thornton Court toward Speedway. SUF 55, 56. Robles and Spraggins held their less lethal weapons. SUF 57. The officers lost sight of Mr. Penny and walked

slowly down Thornton Court trying to locate him. SUF 58.

Concetti observed three bystanders in the alley, though he did not ask them if they had information regarding Mr. Penny, nor did he hear any officer ask them. SUF 59-60. Azmy also did not ask whether they had any connection to Mr. Penny. SUF 61. Robles told the three bystanders to go inside. SUF 62. ███████████████████████████

███████████████████████████████████████████████████████████████

SUF 63.

█████████████████████████████████████████████████████████████████

██████████████████████████ SUF 64. █████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████ SUF 66. █████████████████████████

SUF 65.

### H.    Mr. Penny Continues to Talk About a "Real Blunt" and Picks Up Another Object.

Azmy encountered Mr. Penny on the north side of Thornton Court with the bottle in his right hand. SUF 67. Azmy attempted to speak to Mr. Penny, and Mr. Penny responded by saying "What's a real blunt?" and "Is a real blunt real?" SUF 68. Azmy asked Mr. Penny to put the bottle down. SUF 69. Mr. Penny picked up another object, walked to the south side of the alley, and leaned against a wooden fence. He held the bottle in his right hand and the object in his left hand. SUF 70. To Concetti, it appeared to be a metal object attached to a cloth. SUF 71. Azmy continued to verbalize with Mr. Penny, who responded by asking about a "real blunt" and becoming increasingly agitated.

Mr. Penny appeared to fall behind the wooden fence out of view, as the sound of glass broke. SUF 72. Mr. Penny reappeared and leaned against the same wooden fence on the south side of the alley, with the broken bottle in his right hand and the metal-cloth

object in his left hand. He continued to ask Azmy about a real blunt. SUF 73.

Concetti requested an airship and said "the suspect is being uncooperative at this time" over the radio. SUF 74. He told a man in a white hat to get out of the way and did not ask him whether he knew Mr. Penny. SUF 75.

### I.    Azmy Warns Mr. Penny He Will Be Shot with a Beanbag Shotgun.

Azmy ordered Mr. Penny to put the bottle down, and Mr. Penny responded by throwing the bottle into the middle of the road. SUF 76. Mr. Penny then walked into the street toward the broken glass. Azmy ordered Mr. Penny to "stop it." Mr. Penny picked up a piece of broken glass, and retreated behind the wooden fence on the south side of the alley. SUF 77. Azmy warned Mr. Penny he would "beanbag" him if he didn't comply, which would "cause [him] a lot of harm and a lot of pain." SUF 78. In response, Mr. Penny said, "Just kill me" and "I don't want to be around to save the world." SUF 79. Mr. Penny continued to ask Azmy about a real blunt. SUF 83.

Concetti heard Mr. Penny say "Just kill me." SUF 80. Though he could not understand everything Mr. Penny said, Concetti heard Mr. Penny say, "What is a real blunt?" "Fuck" "No," something along the lines of "Just kill me," and "You're just going to put me in handcuffs." SUF 81. Concetti testified that Mr. Penny was walking back and forth toward the officers throughout the incident. SUF 82.

### J.    Six More Officers Arrive Prior to the Shooting.

██████████████████████████████████████████████████████████████
██████████████████████████████████████████ SUF 84. Sergeant Lawrence Park arrived on scene at least a minute and a half before the shooting. SUF 85. ████████████████████████████ ██████████████████████████████ SUF 86. Park testified Mr. Penny was incoherent and rambling and could not understand most of what he said. SUF 87. ████████████████████████████████████████████████████████████ SUF 88. Azmy decided he had sufficient units and to downgrade the response. SUF 89.

**K.    Mr. Penny Picks Up a Wooden Board and Walks Back to the South Side of Thornton Court as Concetti Unholsters His Pistol.**

Mr. Penny walked across Thornton Court and jumped up and down with the metal-cloth object in his hand while approaching Azmy, who directed Spraggins to beanbag Mr. Penny. SUF 90. Spraggins ordered Mr. Penny to "Get back." Mr. Penny said, "Fuck you." SUF 91. At the same time, Antalek ordered Mr. Penny to "Get back." SUF 92. ██████ ████████████████████████████████████████████████████ SUF 93. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ SUF 94, 98. Concetti believed that anytime someone is holding a wooden board, they could use the board as a weapon. SUF 99. ████████████████████████████████████████████ SUF 95. Concetti was not carrying Oleoresin Capsicum (OC) Spray or a baton. SUF 96.

As Mr. Penny walked back to the south side of Thornton Court, Azmy warned Penny that if he took another step, he would be shot with the beanbag shotgun. When Mr. Penny continued walking, Azmy said "Beanbag him" and Spraggins replied "Beanbag ready." SUF 100. Concetti heard Azmy's warning to Mr. Penny and heard Azmy's order to deploy the beanbag. SUF 101.

**L.    Concetti Sets a Threshold for Mr. Penny.**

At the time of the shooting, Concetti, Robles, and Spraggins stood on the south side of Thornton Court while Antalek, Lara, Azmy and Park stood on the north side of Thornton Court. SUF 103. Mr. Penny stood behind a wall, approached Concetti, Spraggins, and Robles, and then retreated while holding the wooden plank across his body. SUF 104.

Concetti ordered Penny to "Stop" and "Get back" SUF 102. Mr. Penny said "no" when Concetti gave him commands to back off and stop. SUF 108. ██████████



**M.    Concetti Fires Two Shots at Mr. Penny.**

Concetti estimated he shot Mr. Penny from a distance of six to eight feet. SUF 114. Concetti aimed his firearm at Mr. Penny's lower extremities and fired two bullets, even though he was trained in the Academy to aim for center body mass. One bullet entered and exited Mr. Penny's left thigh, and the second bullet entered and exited his left forearm. SUF 115, 116. ██████████████████████ SUF 119.

No one directed Concetti to fire his weapon. SUF 117. At the time the shots were fired, none of the officers knew that Concetti shot Mr. Penny—Robles did not even know that Concetti had unholstered his firearm. SUF 118, 120. ████████████████ SUF 121. ████████████████████

SUF 122. Concetti did not warn Mr. Penny that he would be shot with a gun if he did not comply with his commands, nor did he tell Mr. Penny that he would shoot him if he passed a certain threshold before he fired the shots. SUF 123-24.

Mr. Penny never appeared to be trying to flee the scene. SUF 125. Mr. Penny never

ran at any of the officers. SUF 126. Mr. Penny never threw the bottle, plank, or cloth-metal object at anyone. SUF 127. Mr. Penny did not injure or verbally threaten anyone at the scene. SUF 128-29. According to Robles, Mr. Penny was not continuously actively resisting because he would go toward and away from the officers. SUF 130.

After the shooting, Concetti used a police vehicle as cover. SUF 131-32.

SUF 133.

Officers are trained on the *Graham v. Connor* legal standard for determining whether a particular use of force is objectively reasonable, which is the same standard the LAPD follows in investigating and determining whether uses of deadly force are objectively reasonable and within Department policy. SUF 162-65, 174-78. The LAPD's use of force policy, California Penal Code, and California Peace Officer Standards and Training ("POST") permit deadly force "only when the officer reasonably believes, based on the totality of circumstances, that such force is necessary … [t]o defend against an imminent threat of death or serious bodily injury to the officer or to another person[.]" SUF 176.

SUF 134. The BOPC has civilian oversight of the LAPD and makes final determinations regarding use-of-force investigations that cannot be rejected by the Chief of Police, such as whether a use of deadly force is out of Department policy or warrants administrative disapproval. SUF 135-37, 181. "Administrative Disapproval" is a finding, by a preponderance of the evidence, that the officer's tactics "unjustifiably and substantially deviated from approved Department tactical training" SUF 149. The BOPC adopted the OIG's recommendations in this case. SUF 145.

**1. Concetti's use of lethal force was not objectively reasonable and was out of policy.**

[redacted] SUF 138. [redacted] SUF 139. [redacted] SUF 140, 146, 148. [redacted] SUF 147, 150-51.

**2. Azmy's decision to assume the role of primary communicator deviated without justification from Department policy and supervisory training.**

[redacted] SUF 141.

[redacted] SUF 142. [redacted]

1    ████████████████████████████████████████████████████ SUF 143-

2    44, 153. Azmy also received a notice to correct deficiencies, was found to have operated

3    out of LAPD Policy for assuming the role of contact with Mr. Penny, and participated in

4    extensive retraining following the incident. SUF 152, 154-55.

5          **O.    Concetti and Azmy Violated Generally Accepted Police Practices,**

6                  **Training, and the LAPD's Own Policies.**

7                  **1.    Pre-Shooting Tactics**

8          The LAPD's policy on the use of force states that "[t]he reasonableness of an

9    officer's use of deadly force includes consideration of the officer's tactical conduct and

10   decisions leading up to the use of deadly force." SUF 180. Such pre-shooting tactics

11   include arriving on scene with a coordinated approach, determining why a suspect is

12   noncompliant, using de-escalation tactics, including utilizing time, redeployment or

13   containment, and effective communication with a suspect and other officers. SUF 182-86.

14   Plaintiff's police practices expert Jeffrey J. Noble opined that Concetti's pre-shooting

15   tactics—i.e. not discussing tactics with his partner prior to arriving on scene and not asking

16   bystanders for information about Mr. Penny—were inconsistent with generally accepted

17   police practices. SUF 170.

18         According to Mr. Noble, Azmy's actions in removing himself from his appropriate

19   role as a supervisor and instead taking the lead on negotiations with Mr. Penny were

20   inconsistent with generally accepted police practices. SUF 158. ████████████████

21   ███████████████████████████████████████████████████████████

22   ██████████████████████████████ SUF 159. Mr. Noble further opined that

23   Azmy's failure to maintain oversight and control of the officers that responded to this

24   incident contributed to, or was a cause of, the shooting. SUF 160. Azmy did not ask

25   bystanders if they had any connection to Mr. Penny and he did not give Concetti any

26   assignment. These tactics were inconsistent with generally accepted police practices for a

27   Sergeant and contributed to the shooting. SUF 161.

28   / / /

## 2.   Use of Deadly Force

Officers are trained that deadly force can only be used when all other options have been exhausted and no other reasonable less-intrusive measures are available. Officers are trained that it is important to give a warning that deadly force is going to be used when feasible, because it gives the person time to react and a chance to comply with commands to avoid the need to use deadly force. SUF 171.

Concetti did not warn Mr. Penny that he would shoot him if he did not comply with his commands ████████████████████████████████████████ Mr. Noble opined that it was feasible for Concetti to give Mr. Penny a warning because Concetti ordered Mr. Penny to "Get back" seven times prior to shooting him. SUF 172. There were reasonable less-intrusive measures available to Concetti, such as communicating with Spraggins and Robles who he knew were armed with less lethal options, using his Taser, creating more distance, seeking cover, or giving a deadly force warning and allowing time for Mr. Penny to comply. SUF 173.

In Mr. Noble's opinion, Concetti's use of deadly force was excessive and inconsistent with generally accepted police practices and training. SUF 166. Though Mr. Penny held "a wooden board and a piece of cloth containing a heavy object that could be used as a weapon," he held the "board in front of his body with both hands close to his chest immediately prior to the shooting" and "did not make any movement, either with the board or the heavy object, as if he were about to swing, throw, or strike the officers." Mr. Penny did not present an immediate threat of death or serious bodily injury at the moment that Concetti used deadly force based on the way he was holding the board and the heavy object. SUF 168.

According to Mr. Noble  SUF 169.

Among the factors the LAPD considers when evaluating whether force was objectively reasonable, is whether the person against whom force was used is part of a vulnerable population, including someone with a physical, mental, or developmental disability. SUF 175, 179. Indeed, officers are trained on issues of mental illness; that if a person appears to be under the influence, it may also be due to some form of mental illness; and on suicide by cop. SUF 187-92. According to Mr. Noble, "[a] reasonable officer would have recognized that Mr. Penny was in the midst of a mental health crisis, was intoxicated, or otherwise mentally or emotionally impaired." SUF 167.

### III.   LEGAL STANDARD

Rule 56(c) mandates the entry of summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *See Celotex*, 477 U.S. at 322-23. "A '*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." *United Steel Workers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 252 (1986)) (italics in original).

In addition, "Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1091 (C.D. Cal. 2013). Rule 56(a) explicitly provides for summary judgment on "*part* of each claim or defense." FED. R. CIV. P. 56(a) (emphasis added). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact— including an item of damages or other relief—that is not genuinely in dispute and *treating the fact as established* in the case." *Id*. 56(g) (emphasis added); *see, e.g., Griffith-Guerrero v. Spokane Cnty.*, No. 2:15-CV-342, at 19, ECF No. 42 (E.D.

Wash. June 27, 2017) (granting motion for summary judgment on plaintiff's excessive force claim); *Cooper v. Brown*, 156 F. Supp. 3d 818, 831 (N.D. Miss. 2016) (granting plaintiff's motion for partial summary judgment on liability for excessive force, and denying officer's motion for summary judgment on qualified immunity).

## IV.   ARGUMENT

**A.   Plaintiff is Entitled to Summary Judgment on his First Cause of Action for Excessive Force in Violation of the Fourth Amendment against Defendants Concetti and Azmy.**

### 1.   Concetti Used Excessive and Unreasonable Deadly Force.

This Court should grant summary judgment in Plaintiff's favor because no reasonable jury could find Concetti's use of deadly force against Penny was objectively reasonable. Under the Fourth Amendment, police officers are prohibited from using force that is not objectively reasonable under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). "[O]bjective unreasonableness is a question of law that can be resolved on summary judgment." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The "nature and quality of the intrusion" is weighed against the "countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. "The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

When analyzing the governmental interest in using force, courts consider the non-exclusive *Graham* factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Additional factors include whether the officers were or should have been aware that the suspect was emotionally disturbed, *Glenn*, 673 F.3d at 872; the availability of alternative methods to effectuate an arrest, *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005); whether a warning was given that failure to comply would result in deadly force, *S.R. Nehad v. Browder*, 929 F.3d 1125, 1137-38 (9th Cir. 2019); time, *Deorle v. Rutherford*,

272 F.3d 1272, 1283 (9th Cir. 2001); and the "ratio of officers to suspects", *Washington v. Lambert*, 98 F.3d 1181, 1190 (9th Cir. 1996).

Deadly force is permitted only where "at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). The Ninth Circuit "requires that a reasonable officer under the circumstances believed [himself] or other to face a threat of serious physical harm before using deadly force." *Price v. Sery*, 513 F.3d 962, 971 (9th Cir. 2008).

### a.    The crime at issue was not severe.

It is undisputed that Concetti responded to a call regarding a "shirtless [man] with dark pants screaming in the alleyway", SUF 4, 7, not to a serious or violent crime. Concetti had no information upon his arrival to the scene that a crime had been committed or that anyone had been injured. SUF 29. When Concetti located Mr. Penny, there was no crime in progress; he observed Mr. Penny holding a glass bottle in his hand and agitated. SUF 30. Therefore, the crime at issue was not severe. *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (finding significant under first *Graham* factor that law enforcement was contacted due to plaintiff's "erratic behavior," not a reported crime).

### b.    Mr. Penny did not pose an immediate threat of death or serious bodily injury.

Under the second and "most important" *Graham* factor, *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010),

SUF 139, 167, 168.

SUF 139, 145.

Mr. Noble opined that Mr. Penny "did not make any movement, either with the

board or heavy object, as if he were about to swing, throw, or strike the officers." SUF 166, 168. ████████████████████████████████████████

████████ SUF 121. Additionally, Mr. Penny never ran at any of the officers, never threw the bottle, plank, or metal-cloth object at anyone, and never verbally threatened or injured anyone. SUF 126-129. These facts do not justify lethal force. *See Glenn*, 673 F.3d at 872-73 (jury could find plaintiff's possession of knife and refusal to comply with orders to put the knife down did not justify less lethal force).

Although Concetti may have felt some subjective fear, "[a] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. In deadly force cases, it is improper to "simply accept what may be a self-serving account by the police officer." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (internal citation and quotation marks omitted).

### c.    Mr. Penny was not actively resisting or fleeing.

Under the third *Graham* factor, Mr. Penny never tried to flee the scene and was not actively resisting arrest—he dropped objects when ordered to do so at least twice. SUF 22, 76, 125. He walked toward and away from the officers throughout the incident which Robles admitted meant he was not continuously actively resisting. SUF 25, 55, 70, 77, 82, 94, 104, 130. In Concetti's words, Mr. Penny was simply "uncooperative." SUF 74.

At most, Mr. Penny was passively resisting when he did not comply with all commands at all times. *See Glenn*, 673 F.3d at 875 (use of beanbag gun could be objectively unreasonable where the "crux of the resistance was the refusal to follow officers' commands, rather than actively attacking or threatening officers or others"); *Deorle*, 272 F.3d at 1276-77, 1282-85 (plaintiff's "brandish[ing] a hatchet" and a crossbow and threatening to "kick [the officers'] ass" was insufficient active resistance to justify use of beanbag shotgun). Even if Mr. Penny was not completely passive, resistance "should not be understood as a binary state," and should be viewed in light of the particular facts of the case. *Bryan*, 630 F.3d at 830. The facts here suggest Mr. Penny's occasional

noncompliance was a result of his inability to comprehend, due to ███████ or the officers' issuance of simultaneous commands. SUF 3, 13, 93, 109, 112.

### d. Mr. Penny was mentally ill.

Where an individual exhibits signs of mental illness, this "diminish[es] the governmental interest in using deadly force." *Longoria v. Pinal Cnty.*, 873 F.3d 699, 708 (9th Cir. 2017); *accord Slater v. Deasey*, 789 F. App'x 17, 21 (9th Cir. 2019). "[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed", this is a factor to consider under *Graham. Deorle*, 272 F.3d at 1283 (use of bean bag gun was objectively unreasonable where "the officers [were] confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual"); *accord Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (Plaintiff "was a mentally disturbed individual not wanted for any crime…. Directly causing him grievous injury does not serve that objective in any respect" and the force used was excessive).

The unreasonableness of Concetti's use of deadly force is compounded by the fact that ████████████████. SUF 3. The call was for a "shirtless" and "screaming" man. SUF 4,7. Mr. Penny invited the officers to kill him, repeatedly asked "what's a real blunt", rambled, yelled incoherent statements throughout the incident, and did not appear to understand the officers. SUF 8, 11, 13, 17, 19, 68, 72-73, 79, 80-81, 83, 87.

Officers are trained that if a person appears to be under the influence, it may also be due to some form of mental illness, and on suicide by cop. SUF 187-92. According to Plaintiff's expert Mr. Noble, "[a] reasonable officer would have recognized that Mr. Penny was in the midst of a mental health crisis, was intoxicated, or otherwise mentally or emotionally impaired." SUF 167. The officers' testimony that Mr. Penny appeared to be under the influence and/or was possibly mentally ill, combined with evidence that ████ ████████████████ is further evidence Concetti knew or should have known Mr. Penny was possibly mentally ill. SUF 33-40, 133.

/ / /

### e.  Concetti did not consider alternatives to lethal force.

"[P]olice are 'required to consider what other tactics if any were available to effect the arrest.'" *Headwaters v. Cnty. of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000); *Bryan*, 630 F.3d at 831 (officer did not consider less intrusive tactics when he was or should have been aware that other officers were en route, and their arrival would change the tactical calculus, opening up additional ways to resolve the situation without the need for intermediate force, and this militates against finding the use of force reasonable). Although "officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct … [t]he available lesser alternative are, however, relevant to ascertaining that reasonable range of conduct." *Glenn*, 673 F.3d at 878 (internal citations omitted).

Mr. Noble opined that Concetti failed to exhaust available reasonable less-intrusive measures, such as communicating with less lethal officers Spraggins and Robles, using his Taser, creating more distance, or seeking cover. SUF 173. Indeed, Concetti later used a police vehicle as cover. SUF 131-32, 173. Had Concetti considered any of these reasonable, less intrusive alternatives, the shooting would not have occurred. *See Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) ("[O]fficers could have altered their tactics . . . which would have minimized the degree of force applied…."). Although even Robles' and Spraggins' use of less-lethal weapons was excessive, Concetti's knowledge that his fellow officers were armed with less-lethal weapons diminishes the governmental interest in Concetti's use of deadly force.

Further, Concetti's decision to shoot despite the fact he was not designated lethal cover, was not directed to shoot, knew Azmy warned Mr. Penny he would be shot with a less lethal weapon, and knew Azmy directed another officer to deploy the bean bag shotgun, SUF 45-48, 50-51, 57, 78, 90, 100-01, 117, is far outside the "reasonable range of conduct." *Glenn*, 673 F.3d at 878.

### f.  Concetti made pre-shooting tactical errors.

Concetti made pre-shooting tactical errors that departed from LAPD policy and

contributed to his unreasonable use of lethal force. SUF 180, 182, 183, 184, 185, 186. "[T]he events leading up to the shooting, including the officers' tactics, are encompassed in the facts and circumstances for the reasonableness analysis." *Vos*, 892 F.3d at 1034.

Mr. Noble opined that "[n]o reasonable police officer would set an arbitrary 'threshold' to use force," as Concetti did. SUF 107, 169. ▮▮▮▮▮▮▮ and Ninth Circuit ▮▮▮▮▮▮▮▮▮▮▮▮▮. SUF 139, 145; *see Glenn*, 673 F.3d at 869 (determination to use deadly force if plaintiff moved toward house could be objectively unreasonable); *Deorle*, 272 F.3d at 1275, 1278 (force objectively unreasonable where officer decided to shoot if plaintiff crossed a predetermined, undisclosed line).

Concetti's failure to discuss tactics prior to arriving on scene departed from LAPD policies regarding effective communication and is inconsistent with generally accepted police practices. SUF 27, 170, 182. He gave Mr. Penny commands despite his awareness that other officers were doing the same, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ and failed to communicate with Spraggins and Robles prior to shooting Mr. Penny. SUF 68-69, 72, 78, 91-93, 100-02, 109, 112, 173. This conduct runs counter to LAPD policy, which states "[m]aintaining open lines of communication between officers and communicating effectively with a suspect are critically important." SUF 186. Concetti also failed to properly equip himself with less lethal options, such as OC spray or a baton. SUF 96.

Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SUF 59-66, 75. This was inconsistent with generally accepted police practices and officers' training to gather information from third parties when dealing with a potential suicide by cop situation. SUF 161, 170, 192.

### g. Concetti failed to give Mr. Penny a lethal force warning.

Officers are trained to give a warning that deadly force is going to be used when feasible. SUF 171. Concetti told Mr. Penny to "Get back" seven times before firing his pistol, but never gave Mr. Penny a verbal warning that deadly force was going to be used,

despite it being feasible to do so. SUF 123, 124, 172; *see Nelson*, 685 F.3d at 883 (failure to give adequate warnings loud enough for suspects to hear over a crowd, directing suspects how to comply with dispersal orders, or telling suspects that force would be used against them if they did not behave in a particular manner diminished the governmental interest in applying force); *Bryan*, 630 F.3d at 831 (force was excessive where officer failed to warn plaintiff that he would be Tased if he did not comply with the order to remain in his car); *Deorle*, 272 F.3d at 1282 (use of bean bag gun was objectively unreasonable where officer failed to give plaintiff any warning that he would be shot if he approached any closer).

### h.    Mr. Penny was outnumbered by 13 officers.

SUF 84, 88. Mr. Penny was outnumbered by thirteen officers, seven of whom surrounded him—this is a high "ratio of officers to suspects" that greatly diminishes the government interest in using deadly force. *Washington*, 98 F.3d at 1190 (affirming denial of qualified immunity where two suspects were outnumbered by at least four officers and a police dog); *Longoria*, 873 F.3d at 705 (denying qualified immunity where suspect was surrounded by eight officers at time of shooting).

### i.    Concetti had ample time to observe Mr. Penny.

Lastly, where officers "have had an opportunity to observe [a suspect] for a considerable period of time prior to firing at him" and "a police roadblock" is established, the government interest in using deadly force is diminished. *Deorle*, 272 F.3d at 1283; *see also Nehad*, 929 F.3d at 1131, 1141 (reversing grant of summary judgment including on qualified immunity where officer shot suspect within about a minute of observing him, explaining that "[i]n light of the evidence that [the officer] could have taken more time to evaluate the situation, [his] brief observation of [the decedent] before using lethal force only makes [his] conduct less reasonable."); *Glenn*, 673 F.3d at 876-78 (reversing grant of summary judgment where officers used excessive force within three to four minutes of

their arrival instead of "use[d] time as a tool"). According to LAPD policy, "[i]f a suspect is contained and does not post an imminent threat . . . time can provide an opportunity for the suspect to reconsider his/her actions and decisions." SUF 184.

██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████. SUF 84, 122. Mr. Penny was contained within the alleyway, had little opportunity for escape, and exhibited no signs of fleeing. Concetti could have given Mr. Penny more time to understand what was being requested of him and to comply.

Based on the undisputed facts, all *Graham* factors weigh in Penny's favor. Concetti's use of lethal force against a mentally ill individual who had committed no serious crime, did not actively resist arrest or flee, presented no immediate threat of death or serious bodily injury at the time of the shooting, was surrounded by seven officers with six more officers on scene, without considering available less-intrusive alternatives, employing proper pre-shooting tactics, or giving a proper warning, was objectively unreasonable.

The BOPC applied the *Graham v. Connor* objective reasonableness standard to reach the final, unreviewable determination ████████████████████████████████ ████████████████████████████████████LAPD Policy that only permits deadly force if the officer "reasonably believes, based on the totality of circumstances, that such force is necessary … [t]o defend against an imminent threat of death or serious bodily injury to the officer or to another person." SUF 138, 140, 145-46, 148, 162-66, 174-75, 177-78. These undisputed facts demonstrate summary judgment is proper.

Deadly force can only be used as a last resort in the direst of circumstances, and it is undisputed that this was not one of those cases. *See Glenn*, 673 F.3d at 873-78 (jury could find use of beanbag gun was objectively unreasonable where plaintiff was intoxicated and/or emotionally disturbed, did not verbally threaten or attack anyone with a knife, officers could have created distance, there was no serious crime at issue, the call for service was to an emotionally disturbed individual, plaintiff refused to follow officers' commands rather than actively attacking or threatening officers, and the officers had available less intrusive

options); *Deorle*, 272 F.3d at 1285 (denying qualified immunity to officer who used less lethal force against person who "ha[d] committed no serious offense, [was] mentally or emotionally disturbed, ha[d] been given no warning of the imminent use of such a significant degree of force, pose[d] no risk of flight, [] present[ed] no objectively reasonable threat to the safety of the officer or other individuals", and held an object while walking toward the officer at the time force was used).

### 2. Azmy Is Liable for Concetti's Use of Unreasonable Deadly Force as an Integral Participant and Supervisor.

Integral participation requires only "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007); *accord Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002). The doctrine of "extends liability to those actors who were integral participants in the constitutional violation, even if they do not engage in the constitutional conduct themselves." *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009). "'Integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004). Fundamental involvement can be shown by providing "affirmative physical support at the scene of the alleged violation" which does not require physical contact with the aggrieved party. *Id.* (citations omitted). "[A]n officer could be held liable where he is just one participant in a sequence of events that gives rise to a constitutional violation." *Nicholson v. City of L.A.*, 935 F.3d 685, 691 (9th Cir. 2019). The integral participation doctrine applies to both federal and state law claims. *Bresaz v. Cnty. of Santa Clara*, No. 14-CV-3868, 2015 U.S. Dist. LEXIS 32908, at *5, 6, 15 (N.D. Cal. Mar. 17, 2015).

The undisputed evidence shows Azmy was an integral participant in the use of deadly force. Azmy, the highest-ranking officer, took command upon his arrival. He gave Mr. Penny commands throughout the incident, directed Spraggins to fire his beanbag shotgun at Penny, and witnessed the shooting. SUF 41, 69, 76-78, 100, 113. Azmy led negotiations with Mr. Penny, failed to assign Concetti a role, and failed to communicate with

1  bystanders about Mr. Penny—which Mr. Noble opined were inconsistent with generally

2  accepted police practices. SUF 158, 161 ████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████

5  SUF 141-42. Mr. Noble agreed with these findings, and opined that Azmy's tactics and

6  failure to maintain oversight and control of his subordinates contributed to the shooting.

7  SUF 159-61.

8      Azmy is liable as an integral participant as a matter of law because he actively

9  participated in escalating the encounter and his acts and failures were indispensable to the

10  constitutional violation. *See Boyd*, 374 F.3d at 777-78, 780  (officers who provided armed

11  support were integral participants in use of flash bang device); *Brown v. Grinder*, No. 2:13-

12  CV-1007, 2019 U.S. Dist. LEXIS 10236, at *33-35 (E.D. Cal. Jan. 22, 2019) (finding non-

13  shooting officer to be an integral participant because he "did not simply remain outside or

14  away" from officer during shooting); *Bresaz*, 2015 U.S. Dist. LEXIS 32908, at *14 (officer

15  who attempted to interact with mentally ill decedent can be held liable for second officer's

16  use of deadly force, because first officer "provoke[ed] the Decedent into engaging in the

17  conduct which led to the constitutional and statutory violations at issue in this lawsuit.");

18  *Halbert v. Cnty. of San Diego*, No. 07cv1607-L(WVG), 2010 U.S. Dist. LEXIS 30563, at

19  *46 (S.D. Cal. Mar. 30, 2010) ("Officers who provide armed backup during an operation

20  where excessive force is used are considered integral participants.").

21      These same facts support Azmy's liability as a supervisor. "A supervisor can be

22  liable in his individual capacity for his own culpable action or inaction in the training,

23  supervision, or control of his subordinates…." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th

24  Cir. 2011). "A defendant may be held liable as a supervisor under § 1983 if there is "a

25  sufficient causal connection between the supervisor's wrongful conduct and the

26  constitutional violation." *Id.* (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.

27  1989)). Mr. Noble's opinion that Azmy's failure to maintain oversight and control of his

28  subordinates contributed to the shooting, is sufficient. *Lolli v. Cnty. of Orange*, 351 F.3d

410, 418 (9th Cir. 2003); *see also Hymes v. Bliss*, No. 16-cv-04288-JSC, 2018 U.S. Dist. LEXIS 193518, at *19-20 (N.D. Cal. Nov. 13, 2018) (supervisor's order to enter cell and remove inmate was sufficient involvement in constitutional violation such that summary judgment in his favor was inappropriate). Azmy participated in every part of this ill-advised execution save for pulling the trigger on Concetti's gun.

**B.   Plaintiff is Entitled to Summary Judgment on his Second Cause of Action for Failure to Intervene in Violation of the Fourth Amendment against Defendants Concetti and Azmy.**

For the same reasons that Mr. Penny is entitled to summary judgment on his excessive force claim against Concetti and Azmy, he is entitled to summary judgment on his failure to intervene claim against them. "Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect." *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996) (citations omitted)). "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *Id*. A failure to intercede is an independent violation born from the fact that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). The undisputed evidence shows that Azmy's failures to act were indispensable to the constitutional violations. By removing himself from his appropriate role as a supervisor and instead leading communications with Mr. Penny, Azmy failed to give appropriate direction to Concetti and failed to prevent him from using unlawful lethal force.

**C.   Plaintiff is Entitled to Summary Judgment on his Ninth, Eleventh, Twelfth and Fourteenth Causes of Action for the Bane Act, Assault, Battery by a Peace Officer, and Negligence against Defendants Concetti and Azmy.**

Plaintiff is entitled to summary judgment on his state law claims for battery and

negligence for the same reasons already discussed in connection with his constitutional claims. *See supra* Section IV.A.1. Under California law, assault, battery, negligence, and Bane Act (Cal. Civ. Code § 52.1) claims arising out of excessive force by a peace officer are evaluated using the same Fourth Amendment analysis under *Graham*. *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105-06 (9th Cir. 2014); *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013); *Avina v. United States*, 681 F.3d 1127, 1131 (9th Cir. 2012); *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1121 n. 6 (2004).

Moreover, the California Supreme Court has held that the negligence analysis is even broader than a typical Fourth Amendment analysis because state law specifically considers negligent "pre-shooting" tactics as part of the "totality of the circumstances" evaluation. *Hayes*, 57 Cal. 4th at 639 ("[A]n officer's tactical conduct and decisions preceding the use of deadly force are relevant considerations in determining whether the use of deadly force gives rise to negligence liability, which can arise, for example, if the tactical conduct and decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable."). Even the LAPD's own policies emphasize the importance of proper pre-shooting tactics. SUF 180, 182, 183, 184, 185, 186; *see Grudt v. City of Los Angeles*, 2 Cal. 3d (1970) (failure to follow policies is evidence of negligence); *accord Dillenbeck v. City of Los Angeles*, 69 Cal. 2d 472, 477-78 (1968). In this case, Concetti's pre-shooting tactics were inconsistent with generally accepted police standards and were negligent. *See supra* Section II.O.1, IV.A.1.

## V.    CONCLUSION

With respect to each of the issues on this motion, there is no genuine dispute of material fact and summary judgment in Plaintiff's favor is appropriate.

Dated: February 25, 2022                Respectfully Submitted,

HADSELL STORMER RENICK & DAI LLP


By: _____
      Shaleen Shanbhag
Attorneys for Plaintiff John Sylvester Penny